IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ADRIANNA TUEL, ) | CASE NO.  5:21-CV-01586-DAR |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE DAVID A. RUIZ |
| vs. ) | UNITED STATES MAGISTRATE |
| ) | JUDGE |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ADMINISTRATION, ) | MAGISTRATE JUDGE |
| ) | JONATHAN D. GREENBERG |
| Defendant. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | |

Plaintiff, Adrianna Tuel ("Plaintiff" or "Tuel"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In December 2018, Tuel filed an application for POD, DIB, and SSI, alleging a disability onset date of October 26, 2018 and claiming she was disabled due to Chiari malformation.  (Transcript ("Tr.")

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

15, 63-64, 76-77, 91-92, 105-06.) The applications were denied initially and upon reconsideration, and Tuel requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 15.)

On June 15, 2020, an ALJ held a hearing, during which Tuel, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On August 5, 2020, the ALJ issued a written decision finding Tuel was not disabled. (*Id.* at 15-27.) The ALJ's decision became final on June 10, 2021, when the Appeals Council declined further review. (*Id.* at 1-6.)

On August 14, 2021, Tuel filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 9, 11.) Tuel asserts the following assignment of error:

> (1) The Administrative Law Judge's decision is not supported by substantial evidence when he failed to properly analyze the listings of impairments and Plaintiff's maximum RFC pursuant to SSR 19-4.

(Doc. No. 9 at 9.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Tuel was born in April 1992 and was 28 years-old at the time of her administrative hearing (Tr. 15, 25), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has at least a high school education and is able to communicate in English. (Tr. 25.) She has past relevant work as a nursing home attendant, flight attendant, office nurse, and phone nurse. (*Id.* at 55.)

2

**B.**     **Medical Evidence[2]**

A September 17, 2016 brain MRI revealed no acute intracranial abnormality but showed a Chiari malformation with mass effect on the cervical medullary junction.  (*Id.* at 766.)  The MRI also revealed a 0.5 cm T2 hyperintense focus within the pituitary gland to the left of midline that the reviewing physician recommended be evaluated for microadenoma.  (*Id.*)

An October 22, 2016 brain MRI showed delayed enhancement of the previously identified pituitary abnormality, which was concerning for a microadenoma, as well as Chiari malformation.  (*Id.* at 764.)

On November 9, 2017, Tuel underwent a redo suboccipital craniectomy.  (*Id.* at 1295.)

On November 24, 2017, Tuel went to the emergency room complaining of neck pain, neck stiffness, and some fluid leaking from her incision site.  (*Id.* at 1376.)  Tuel also reported a mild and dull headache.  (*Id.*)  A CT scan revealed a small midline suboccipital fluid collection in the craniectomy defect, and Tuel underwent a wound revision procedure.  (*Id.* at 1377.)

A January 31, 2018 brain MRI revealed evidence of recent suboccipital craniotomy revision and a small amount of fluid at the operative site.  (*Id.* at 517.)  The impression was postoperative changes of redo suboccipital craniotomy with slightly lower position of cerebral tonsils and lineal enhancement or scarring.  (*Id.*)

On June 19, 2018, Tuel saw Andrew Stalker, M.D., with complaints of headaches.  (*Id.* at 474.)  Tuel reported burning pain in the back of her head where she had her surgery and that her headaches were getting worse to the point her whole head was throbbing.  (*Id.*)  While light did not affect her headaches, sound made them worse.  (*Id.*)  Tuel denied nausea and vomiting.  (*Id.*)  Tuel reported taking Tylenol three

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Tuel challenges only the ALJ's findings related to her physical impairments, the Court further limits its discussion of the medical evidence accordingly.

times a week with no relief.  (*Id.*)  While Neurontin helped at first, it did not seem to work as well.  (*Id.*)  Magnesium helped her leg cramps but did not help her headaches.  (*Id.*)  On examination, Dr. Stalker found Tuel in no acute distress and found normal speech and language, as well as normal gait and station.  (*Id.* at 476.)  Dr. Stalker changed Tuel's medication to 400 mg of Gabapentin twice a day and continued her magnesium.  (*Id.*)

On February 20, 2019, Tuel saw Angela Rickard, PA-C, with complaints of headaches.  (*Id.* at 578.)  Tuel reported amitriptyline helped for the first couple days but then stopped working.  (*Id.*)  Tuel complained of daily headaches in the bilateral occipital and parietal regions that felt like a "'thunder storm and burning in [her] head.'"  (*Id.*)  Tuel reported blurred vision, sensitivity to light and sound, nausea, and dizziness.  (*Id.*)  Tuel told Rickard she was only sleeping for a total of six hours a night.  (*Id.*)  On examination, Rickard found Tuel in no acute distress with normal speech and language, normal muscle strength and tone, and normal gait and station.  (*Id.* at 580.)  Tuel's diagnosis consisted of chronic migraine without aura, intractable, without status migrainosus.  (*Id.*)  Rickard stopped amitriptyline and started Tuel on Inderal.  (*Id.* at 580-81.)  Rickard also ordered Botox, renewed Tylenol #3 one more time to be used sparingly, and directed Tuel to increase her sleep, decrease her stress, adjust her diet, and keep a headache log.  (*Id.* at 581.)

On March 14, 2019, Tuel saw John Hill, M.D., for evaluation of her head, neck, and shoulder pain.  (*Id.* at 563.)  Tuel rated her pain as a 5-7/10 and described it as sharp, aching, burning, and throbbing.  (*Id.* at 566.)  Tuel reported resting in a dark, quiet room and medication helped her pain, while movement, sound, and light made it worse.  (*Id.*)  Tuel told Dr. Hill she got a 50% reduction in her pain with her current medications.  (*Id.*)  After two surgeries for her Chiari malformation, Tuel still experienced chronic headaches.  (*Id.*)  Tuel reported ringing in the ears but no hearing loss, numbness of feet and fingers, dizziness, daily severe headaches, no weakness, and no back pain.  (*Id.* at 567.)  On examination, Dr. Hill

4

found normal gait, cervical spine tenderness and reduced range of motion, normal thoracic and lumbar spine range of motion, normal motor strength, and normal sensation.  (*Id.*)  Dr. Hill diagnosed Tuel with cervical post-laminectomy syndrome, Chiari malformation, chronic headache disorder, and long-term drug therapy.  (*Id.* at 568.)  Dr. Hill prescribed a pain patch and amitriptyline.  (*Id.*)

On April 10, 2019, Tuel underwent Botox injections for her chronic migraines.  (*Id.* at 577.)

On May 21, 2019, Tuel saw PA-C Rickard for follow up.  (*Id.* at 573.)  Tuel reported her headaches remained unchanged, she was still getting them daily, and they felt the same as they had before.  (*Id.*)  Tuel also told Rickard she was feeling a cracking sensation when she rotated her neck, rolled over in bed, or washed or dried her hair.  (*Id.*)  This sensation was followed by burning pain for an hour and caused Tuel to lay down.  (*Id.*)  Tuel reported laying down in a dark room and an ice cap helped.  (*Id.*)  Rickard increased Tuel's amitriptyline, ordered another MRI, and again recommended Tuel keep a headache log.  (*Id.* at 574.)  Rickard also diagnosed Tuel with cervicalgia.  (*Id.*)

On June 7, 2019, Tuel saw Jeff Tarcy, PA-C, for a neurological consultation.  (*Id.* at 772.)  Tuel reported feeling like "her brain is 'falling out of the back of her head.'"  (*Id.* at 773.)  Tuel complained of throbbing occipital pain that radiated to the front, light and sound sensitivity, and a pressure sensation in her occipital area that got worse when she laughed, ran on the treadmill, sneezed, bent, made other movements, or felt vibrations that resolved after 20 seconds but happened many times a day.  (*Id.*)  Tuel reported a suboccipital cracking sensation with range of motion of her neck that was followed by a burning sensation from the middle of her head down her neck, neck tightness and stiffness, ongoing paresthesias in her feet and fingertips that had improved since her last surgery, dizziness with changes in position, some blurry vision that was stable, and ringing of the ears since her first surgery.  (*Id.*)  On examination, Tarcy found some tenderness to palpation over the suboccipital area, good range of motion of the neck, normal muscle strength and tone, normal mental status, and normal gait.  (*Id.* at 774-75.)

Tarcy thought the risks of further surgery may outweigh the benefits and recommended a consult to the headache clinic.  (*Id.* at 775.)

On July 1, 2019, Tuel saw Stephen Samples, M.D., for an evaluation regarding her headaches.  (*Id.* at 782.)  Tuel complained of daily headaches that occurred in the back of her head, and a few times a week the pain went over the top of her head and became her typical migraine headaches.  (*Id.*)  On examination, Dr. Samples found minimal neck tenderness (although Tuel was mid-Botox treatment), normal strength, intact sensation, normal cerebellar exam, normal gait, negative Romberg, and the ability to toe walk, heel walk, and tandem walk.  (*Id.*)  Dr. Samples noted Tuel also had anxiety and depression and that it was hard to tell if her headaches were only migraines or some combination.  (*Id.*)  Dr. Samples prescribed Effexor, as well as Maxalt for severe headaches.  (*Id.*)

A July 22, 2019 brain MRI revealed post-operative findings related to decompression,  Chiari one malformation,  and susceptibility artifact among the lateral aspect of the right tonsil that were likely postoperative blood products.  (*Id.* at 790.)

On September 2, 2019, Tuel went to the emergency room with complaints of headache, blurred vision, and clear fluid dripping from her right nostril.  (*Id.* at 815.)  Tuel reported her headaches were usually a 5/10 but over the past few days her headaches had worsened with the pain an 8/10.  (*Id.*)  Laying down made the headaches worse, while sitting up improved them.  (*Id.*)  Tuel reported nausea, intermittent vomiting, light sensitivity, and intermittent jumping of her vision.  (*Id.*)  Tuel further reported several drops of clear fluid from her right nostril that had occurred once the day before and twice that day, prompting her to come into the emergency room.  (*Id.*)  Tuel denied trauma or similar symptoms but reported sinus pressure and pain over her sinuses bilaterally, which was new for her.  (*Id.*)  On examination, treatment providers found normal range of motion, tenderness over the cervical paraspinal muscles and trapezius muscles bilaterally, normal reflexes, normal sensory exam, normal muscle tone, and

normal coordination.  (*Id.* at 816.)  While Tuel's history was concerning for a possible CSF leak, no active leak was shown on examination and imaging.  (*Id.* at 818.)

On October 2, 2019, saw Cathy Dobrowski, APRN, CNP, for a follow up visit regarding her headaches.  (*Id.* at 844.)  Tuel reported daily headaches that she rated a 6/10 and that she got severe headaches that she rated a 10/10 once a week that lasted part of the day before easing.  (*Id.*)  Her headaches worsened with laughing, sneezing, and coughing.  (*Id.*)  They started in the occipital region and the top of her neck, but when severe radiated forward to her eyes.  (*Id.*)  Tuel described the pain as sharp, throbbing, aching, burning, piercing/stabbing, pressure, and exploding.  (*Id.*)  Associated symptoms included light and sound sensitivity, nausea, lightheadedness, unsteadiness, numbness, blurred vision, confusion, neck tightness and pain, dizziness with positional changes, and ringing of the ears.  (*Id.* at 844-45.)  Weather changes, loud noise, bright lights, and too little sleep/fatigue worsened her headaches, while rest, dark, quiet, and cold improved them.  (*Id.* at 845.)

On examination, Dobrowski found Tuel grimacing and rubbing her head, as well as solicited and unsolicited verbal complaints.  (*Id.* at 847.)  Dobrowski further found tenderness to palpation of the cervical spine and upper trapezius bilaterally, suboccipital tenderness bilaterally, muscle spasms bilaterally, decreased cervical range of motion in all directions, significant tenderness in the greater occipital groove, normal tone and strength, normal coordination, and normal gait.  (*Id.*)  Dobrowski noted she would get an authorization for Aijovy infusions and started Tuel on Toradol, Metoprolol, and Sumatriptan.  (*Id.* at 847-48.)  Dobrowski also administered a greater occipital nerve block.  (*Id.*)

On November 8, 2019, Tuel saw treatment providers for her third day of infusions.  (*Id.* at 893.)  Before her third infusion, Tuel reported improvement in her headache, which she rated as a 5/10 and described as throbbing in the occipital region.  (*Id.*)  After the infusion, Tuel rated her headache as a 1/10.  (*Id.*)

On November 27, 2019, Tuel underwent a therapeutic lumbar puncture.  (*Id.* at 919.)

On February 18, 2020, Tuel saw Lisa Lystad, M.D., for an eye exam.  (*Id.* at 935.)  Tuel reported blurred vision, daily headaches, and vertigo.  (*Id.*)  While Tuel had a history of astigmatism, she had not worn glasses in two years.  (*Id.*)  On examination, Dr. Lystad found 20/20 vision and full visual fields in both eyes.  (*Id.* at 938.)

On April 7, 2020, Tuel saw PA-C Rickard for follow up after last being seen in May 2019.  (*Id.* at 957.)  Tuel reported unchanged headaches and that amitriptyline did not help, nor did metoprolol or Aijovy.  (*Id.*)  Tuel told Rickard she was seeing pain management, had been getting injections, and taking Tylenol #3.  (*Id.*)  Tuel complained of daily debilitating headaches that made it hard to do her daily activities.  (*Id.*)  Rickard switched Tuel from metoprolol to Inderal.  (*Id.* at 959.)

## C.     State Agency Reports

On March 2, 2019, William Bolz, M.D., opined Tuel could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and her ability to push and/or pull was unlimited, other than shown for lift and/or carry.  (*Id.* at 71-73, 84-86.)  Tuel could frequently climb ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 72, 85.)  Tuel could occasionally balance and frequently stoop, kneel, crouch, and crawl.  (*Id.*)  Tuel must avoid all exposure to hazards.  (*Id*. at 72, 86.)

On August 14, 2019, on reconsideration, Lynne Torello, M.D., affirmed Dr. Bolz' findings.  (*Id.* at 100-02, 114-16.)

## D.     Hearing Testimony

During the June 15, 2020 hearing, Tuel testified to the following:

- She lives with her parents and 19-month-old daughter.  (*Id.* at 40.)  She has a driver's license and drives twice a week to the store or a local doctor appointment.  (*Id.*)

- Around the time she alleged her disability began, she had just had her second brain surgery and ended up having a leak.  (*Id.* at 45-46.)  She had to undergo emergency surgery in Pittsburgh and then she was on a PICC line for two months.  (*Id.* at 46.)  She tried to return to work as a phone nurse in early 2019, but the ringing of the phone and the lighting in the office caused her headaches and nothing helped.  (*Id.* at 47.)  She also needed to stand and stretch and make sure her neck wasn't getting too stiff, and her supervisors got upset because it was ten minutes taken away from doing her job.  (*Id.* at 47-48.)  She had to stretch for ten minutes at least once an hour.  (*Id.* at 48.)

- Her parents help care for her daughter.  (*Id.*)  Her mom was working as a full-time nurse but had to drop to part-time so she could help more.  (*Id.* at 48-49.)  Her daughter's father also helps when he is not at work.  (*Id.* at 49.)  Her mother helps her prepare food for her daughter in advance so she can just microwave it.  (*Id.*)  Her daughter is thirty pounds and the maximum amount she can lift, so she has to be careful when lifting her or she will hear a crack in her neck and in about two hours she will have a headache and dizziness and vomiting.  (*Id.*)

- She can cook, but she needs help getting pots and pans out and lifting a gallon of milk from the bottom of the refrigerator.  (*Id.* at 50.)  She has good days and bad days.  (*Id.*)  On good days she plays with her daughter or cooks a meal herself but has to be careful that she does not do too much or the next few days she will have head pain, dizziness, and nausea.  (*Id.*)  She has headaches even on her good days.  (*Id.* at 51.)  On bad days she lays in bed and tries to make sure her neck doesn't get too stiff and wears an ice cap to help her pain.  (*Id.*)  Her room is dark and quiet.  (*Id.*)  Even on her good days she lays down throughout the day, several times a day for 20-30 minutes.  (*Id.* at 52.)

- Light, noise, and smell can trigger her headaches.  (*Id.* at 51.)

The VE testified Tuel had past work as a nursing home attendant, flight attendant, office nurse, and phone nurse.  (*Id.* at 55.)  The ALJ then posed the following hypothetical question:

> For the first hypothetical, I'd like you to assume an individual of the claimant's age, education, and work experience, who is capable of performing light work as defined by the regulations, and has the additional limitations.  Can perform all postural movements frequently, however, can only occasionally balance, and should never climb ladders, ropes, and scaffolds.  Should avoid concentrated exposure to extreme heat, humidity, and vibrations.  And should avoid all hazards.  Could this individual perform the Claimant's past work?

(*Id.* at 55-56.)

9

The VE testified the hypothetical individual would be able to perform Tuel's past work as an office nurse.  (*Id.* at 56.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as merchandise marker, mail sorter, and routing clerk.  (*Id.*)

The ALJ reduced the exertional level to sedentary, and the VE testified the hypothetical individual could perform Tuel's past work as a phone nurse and also perform other representative jobs in the economy, such as addresser, document preparer, and nut sorter.  (*Id.* at 56-57.)

The ALJ asked the VE how much absentee time would be tolerated, and the VE testified one day a month would be the limit before a person could not maintain competitive employment.  (*Id.* at 59.)  The ALJ asked the VE how much time off task would be tolerated, and the VE testified ten percent of the workday.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Tuel was insured on her alleged disability onset date, October 26, 2018, and remains insured through March 31, 2024, her date last insured ("DLI").  (Tr. 15-16.)  Therefore, in order to be entitled to POD and DIB, Tuel must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Seecurity Act through March 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since October 26, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*., and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: chiari malformation, cervical post-laminectomy syndrome and chronic headache disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, occasionally balance, and never climb ladders, ropes or scaffolds.  She should avoid concentrated exposure to extreme heat, humidity, and vibrations.  In addition, she should avoid all exposure to hazards, such as unprotected heights and dangerous moving machinery.

6.  The claimant is capable of performing past relevant work as an office nurse.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from October 26, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-27.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    Substantial evidence supports the ALJ's Listings analysis.

Tuel asserts that while the ALJ properly considered Listing 11.02 in accordance with SSR 19-4p, *Evaluating Cases Involving Primary Headache Disorders*, the ALJ erred in finding that Tuel's headaches did not equal Listing 11.02 because there was "no opinion from a medical expert that states that the claimant equals a listing."  (Doc. No. 9 at 10.)  Tuel argues SSR 19-4p and Listing 11.02 "do not require any such statement from a medical expert to meet the criteria of this Listing/Ruling."  (*Id.*)  Tuel asserts the ALJ failed to address relevant evidence in the Listing analysis, instead focusing "on irrelevant factors and issues not material to" medical equivalence, and "failed to elicit medical expert testimony at the hearing or by interrogatories after the hearing."  (*Id.* at 13.)

The Commissioner responds that the ALJ "provided the necessary minimum articulation at Step Three," and the ALJ "was not required to articulate specific evidence to support his finding."  (Doc. No. 11 at 5) (citation omitted).  The Commissioner asserts that, reading the decision as a whole, the ALJ

14

considered the medical evidence of record, Tuel's subjective statements, and Tuel's functional abilities in finding Tuel did not meet Listing 11.02 and in determining the RFC.  (*Id.* at 6-7.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed

15

Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Here, at Step Two, the ALJ determined Tuel suffered from the severe impairments of Chiari malformation and chronic headache disorder.  (Tr. 18.)  At Step Three, the ALJ determined Tuel's impairments did not meet or medically equal the requirements of a Listing, explaining as follows:

> The claimant does not meet or medically equal Listing 11.04, *Vascular insult to the brain*, as the record fails to demonstrate a central nervous system vascular accident accompanied by one of the following more than three months post-vascular accident 1) sensory or motor aphasia resulting in ineffective speech or communication; 2) significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (with reference to 11.00C) or (3) marked limitations in physical functioning and in one of the following areas of mental functioning: understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, or adapting or managing oneself.
>
> In accordance with SSR 19-4p, primary headaches is not a listed impairment, however, the undersigned may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing. Thus, the undersigned finds the severity of the claimant's migraine headaches does not equal any of the listings described at 11.02, *Epilepsy*, as there is no opinion from a medical expert that states that the claimant equals a listing.

(*Id.* at 20-21.)

For the following reasons, the Court finds remand is not required.  Although the ALJ's Step Three discussion is brief, the ALJ specifically stated that he considered whether Tuel's impairments medically equaled Listing 11.04 and Listing 11.02 in accordance with SSR 19-4p.  While it would have been preferable for the ALJ to discuss the medical evidence regarding these conditions in the context of the Step Three analysis, the Sixth Circuit has found that, even where an ALJ's Step Three analysis is insufficient, remand is not required where the error is harmless.  *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th

16

Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn. March 26, 2015).  Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."  *Forrest*, 591 F. App'x at 366.  *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

Here, the ALJ discussed the medical evidence regarding Tuel's Chiari malformation and chronic headache disorder in the RFC analysis.  The ALJ acknowledged Tuel's testimony that she had tried to go back to work after her second surgery but could not continue to work because of her headaches, that she needed to take 10 minute breaks at least once an hour to make sure her neck did not get too stiff and relieve the pressure, that noise, light, and smells aggravated her headaches, that if she does too much one day she will get head pain, dizziness, and nausea the next day, that she has good days and bad days, with

bad days more than half the month, that she lays down throughout the day for 20-30 minutes at a time, and she needs help to care for her 19-month-old daughter.  (*Id.* at 22.)  However, as the ALJ found, in October 2019 Tuel reported Lopressor was helping her headaches, her headaches improved after her first injection, treatment notes showed a reduction in headache intensity, trigger point injections provided 60% pain relief, and in March 2020 Tuel reported she was working out every night.  (*Id.* at 23.)  In addition, the ALJ further found:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with the evidence of record, which shows that the claimant's headaches improved with medication as evidenced by the claimant return to daily exercise and self-reports of relief. Moreover, physical examinations of the cervical spine show mostly decreased range of motion and tenderness, with no loss of strength or sensation in the bilateral upper extremities. Similarly, neurological examinations were relatively unremarkable.  Furthermore, the claimant presented to examinations in no acute distress and the record does not appear to show any longitudinal restrictions (Exhibits 9F/11; 17F/76; 19F/7). In addition, the claimant is able to prepare simple meals, perform self-care, drive, perform household chores, and care for her daughter. As such, the undersigned finds the claimant is able to perform light work, with postural and environmental limitations.

(*Id.* at 24.)

Moreover, as the ALJ correctly notes, no medical expert opined Tuel met or equaled a Listing. Indeed, both state agency physicians determined Tuel did not meet or medically the requirements of any listed impairment.[3]  *See Ison*, 2017 WL 4124586, at *8 (stating "the state agency medical examiner's

---

[3] In light of these state agency physician opinions, the Court rejects Tuel's suggestion the ALJ erred in failing to "elicit medical expert testimony" regarding the issue of medical equivalence.  (Doc. No. 9 at 13.) While a medical expert's opinion "is required before a determination of medical equivalence is made," *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995)), the Sixth Circuit considers the signature of a state agency physician on a disability determination to be probative evidence that medical equivalence was considered. *See Hicks v. Comm'r of Soc. Sec.*, 105 F. App'x 757, 762 (6th Cir. 2004) (quoting SSR 96-6p, 1996 WL 374180 (July 2, 1996)) ("The signature of a State agency medical or psychological consultant ... ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.") *See also Ison*, 2017 WL 4124586, at *8.  Although the state agency reviewing physicians did not list Listing 11.02 on the disability determination forms, Tuel did

assessments provide substantial evidence that medical equivalence was considered but not found for Ison's conditions."). *See also Jones v. Astrue*, No. 3:08cv00224, 2009 WL 2827942, at **12-13 (S.D. Ohio Sept. 1, 2009) (finding the ALJ properly relied on the medical opinions from the state agency medical examiners when determining medical equivalence.) Tuel raises no argument regarding the sufficiency of the state agency reviewing physicians' opinions or the sufficiency of their determinations regarding the Listings and/or medical equivalence.

**B.     Substantial evidence supports the ALJ's RFC analysis.**

Tuel argues the ALJ's RFC analysis lacks substantial evidence as the ALJ failed to "sufficiently consider the effect of Plaintiff's migraine headaches on her ability to sustain work, day in and day out." (Doc. No. 9 at 13-14.) Tuel asserts the ALJ "does not account whatsoever for the frequency of Plaintiff's headaches in his RFC in terms of sustaining work or being absent from work." (*Id.* at 15.) The Commissioner does not directly respond to this argument. (Doc. No. 11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that

---

not raise this as error in her brief or otherwise argue that it affected the sufficiency of the ALJ relying on these opinions for purposes of medical equivalence, and therefore the issue is not before the Court.

evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that

an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

As explained above, the ALJ found Tuel's statements regarding the frequency and severity of her symptoms to be inconsistent with evidence of record showing her headaches improved with medication as shown by her return to daily exercise and her self-reports.  (Tr. 24.)  It is not for this Court to reweigh the evidence on judicial review.  In addition, Tuel fails to challenge the ALJ's findings regarding the state agency reviewing physicians' opinions, who found Tuel capable of performing medium work with postural and environmental limitations.  The ALJ found the postural and environmental limitations persuasive because they were supported by the evidence and consistent with the evidence of record received at the hearing level, although the ALJ reduced the exertional level to light in consideration of Tuel's testimony regarding her functional limitations.  (*Id.* at 24-25.)  The Court is able to trace the path of the ALJ's reasoning regarding Tuel's RFC.  There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: May 25, 2022                                         *s/ Jonathan Greenberg*
                                                          Jonathan D. Greenberg
                                                          United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**